UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CARL SELF,
  Plaintiff,

v.                 Case No. 18-C-1823

CORPORAL BERGH, *et al.*,
  Defendants.

## ORDER

Plaintiff Carl Self, a Wisconsin state prisoner who is representing himself, filed this lawsuit under 42 U.S.C. § 1983. I screened the plaintiff's complaint and allowed him to proceed on claims under the Eighth Amendment. The parties have stipulated to the dismissal of Nurse Ava Gonzales. ECF No. 77. I will accept the stipulation and dismiss defendant Gonzales from this case. The remaining defendants move for summary judgment. ECF No. 61. I consider that motion in this order.

## I. BACKGROUND[1]

The plaintiff sues four officials at the Brown County Jail ("Jail"), where he was a pretrial detainee during all relevant times: Corporal Zachary Bergh and Correctional Officers Brian Ostrenga, Wade Delorit, and Alek Pearson. ECF No. 69, ¶¶ 1–5.

### A. Relevant Jail Policies and Procedures

---

[1] Facts in this section are taken from the defendants' proposed findings of fact and declarations in support of their motion for summary judgment. ECF Nos. 62–67, 69. The plaintiff did not respond to the defendants' proposed findings of fact or provide his own statement of proposed findings of fact, as this court's local rules require. *See* Civil L. R. 56(b)(2)(B)(i)–(ii). Therefore, I will consider the defendants' proposed facts admitted for purposes of this decision. *See* Civil L. R. 56(b)(4); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission.").

Inmates requiring medical treatment at the Jail fill out an Inmate Request Form, which the medical staff evaluates and triages to determine which requests need immediate attention. ECF No. 69, ¶ 8. The medical professionals at the Jail are independent contractors and not employees of Brown County. *Id.*, ¶ 7. Officers and Supervisors of the Jail have no involvement in evaluating requests for medical care, unless there is an emergency situation that requires immediate attention. *Id.*, ¶ 8. Once admitted to the Jail, the plaintiff was given a copy of the inmate handbook, which informs inmates of the Jail's medical-care procedures. *Id.*, ¶ 6.

The Jail uses "OC spray" to disengage or incapacitate inmates. ECF No. 69, ¶ 25. OC spray is reddish in color and is biodegradable. *Id.* Because the spray is red, it may appear as blood on a Jail uniform. *Id.* If an officer uses OC spray on an inmate, the officer must assess whether the inmate was sprayed directly in the face or eyes. *Id.*, ¶ 26. If an officer uses OC spray on an inmate, the inmate is allowed to use soap and water to wash himself once he is placed in a new housing unit. *Id.*, ¶ 27. If the officer can detect a medical issue, he must contact the medical staff and inform them of the incident and the inmate's need for treatment. *Id.* If an inmate is verbally or physical abusive, medical staff may wait to evaluate the inmate for their own security and safety. *Id.*, ¶ 28.

**B.     The September 26, 2018 Incident**

On September 26, 2018, at about 9:40pm, Correctional Officer Pelischek (who is no longer a defendant) heard a loud thud coming from the Gulf Pod dayroom, where he saw the plaintiff fighting with another inmate. ECF No. 69, ¶ 9. Pelischek called for backup, approached the dayroom door, and instructed the fighting inmates to stop and all inmates to go onto lockdown. *Id.*, ¶ 10. The plaintiff and the other inmate continued to

grab and punch each other, while Pelischek repeated his command to stop. *Id.* When the inmates did not stop their fight, he warned them to "[b]reak it up now or you will get sprayed." *Id.* The inmates continued to fight, so Pelischek sprayed OC spray through the food trap and into the dayroom at the two inmates. *Id.*, ¶ 11. Pelischek saw the spray hit the plaintiff on the left side of his head. *Id.* He continued to order the inmates to "break it up and lock in." *Id.*, ¶ 12. Other officers arrived at the dayroom, handcuffed the plaintiff's opponent, and took him for medical treatment. *Id.*, ¶¶ 12–13. The plaintiff secured himself in his cell before officers escorted him out. *Id.*, ¶ 14. When asked if he needed medical attention, the plaintiff stated, "No, I'm good." *Id.*, ¶ 15. Immediately after the fight, officers transferred the plaintiff from Gulf Pod to Fox Pod. *Id.*, ¶ 16. After he was transferred, medical staff were informed that the plaintiff requested medical care. *Id.*, ¶ 17.[2]

Inmates in Fox Pod typically are provided a hygiene kit, which includes soap, a toothbrush, and toothpaste. ECF No. 69, ¶ 19. Inmates also are provided a towel and have access to water via the sink inside their cell. *Id.* Inmates are allowed to shower every day during their hour of recreation time and are informed as such at the start of that hour. *Id.*, ¶ 21. Inmates may choose not to shower during their recreation hour. *Id.* Pod officers generally are responsible for obtaining new uniforms for inmates in that pod from the laundry facility. *Id.*, ¶ 24. If the pod does not have extra uniforms on hand, any request for a new uniform made during evening and night hours must wait until the first shift when the laundry facility opens. *Id.*

---

[2] The next day, September 27, 2018, Self complained to the medical staff about a reaction he had to the OC spray used on him to break-up the fight. ECF No. 69, ¶ 18. Because the parties have dismissed Nurse Gonzales, the adequacy of the plaintiff's medical treatment is not an issue in this decision.

The plaintiff was given a bar of soap and a towel by the end of the next day, September 27, 2018, though the defendants do not pinpoint the exact time. ECF No. 69, ¶ 20. He also showered sometime that day. *Id.*, ¶ 22. Correctional Officer Lauder (who is no longer a defendant) gave the plaintiff a new uniform sometime during his shift between 6:30pm on Friday, September 28, 2018, and 6:30am the next day, September 29, 2018. *Id.*, ¶ 23.

### C. Each Official's Involvement

#### 1. Corporal Bergh

As a corporal, Bergh did not conduct regular rounds of every pod at the Jail and was not informed of every issue or inmate complaint. ECF No. 69, ¶ 67. He would often, but not always, respond to a pod if there was an incident or question about an inmate. *Id.*

Bergh worked at the Jail from 6:30pm on September 26, 2018, through 6:30am on September 27, 2018, and again from 6:30pm on September 27, 2018, through 6:30am on September 28, 2018. ECF No. 69, ¶ 65. At approximately 9:41pm on September 26, 2018, Officer Pelischek notified Bergh about the fight between the plaintiff and the other inmate. *Id.*, ¶ 68. Bergh reported to the cell with security staff. *Id.* Once at Gulf Pod, Pelischek told Bergh he had ordered the inmates to stop fighting and, when they would not comply, used his OC spray on both inmates. *Id.*, ¶ 69. He told Bergh the spray had hit the plaintiff on his left side but not directly in his face or eyes. *Id.*, ¶ 70. Bergh could see the spray on the plaintiff because of its red color. *Id.* He did not see any spray on the plaintiff's face or notice the plaintiff experiencing any negative reactions to the spray, including difficulty breathing. *Id.*, ¶¶ 71–72. Nor did Bergh see any blood on the plaintiff's

uniform. *Id.*, ¶ 72. Bergh asked the plaintiff if he needed medical attention, and the plaintiff said he did not. *Id.*, ¶ 71.

The plaintiff was verbally argumentative and noncompliant during his transport to Fox Pod. ECF No. 69, ¶ 73. Once in Fox Pod, the plaintiff requested a shower and for care for the OC spray. *Id.*, ¶ 74. Because he was uncooperative and argumentative, Bergh instructed him to use the sink to wash up and did not risk the security or safety of medical staff to treat the plaintiff or provide him a shower. *Id.* Based on the information he received and his observations of the plaintiff, Bergh did not believe that the plaintiff needed immediate medical attention. *Id.*, ¶ 75. He told the plaintiff that staff would be instructed to provide him a new uniform, if one was available in the pod, as soon as the plaintiff calmed down and complied with officers. *Id.*, ¶ 76. Bergh relayed his conversation with the plaintiff to Jail staff and told them to provide the plaintiff a new uniform as soon as possible. *Id.*

Bergh then walked to the Jail's medical department and told the medical staff about the plaintiff's fight, Pelischek's use of OC spray on the plaintiff, and the plaintiff's request for OC care. ECF No. 69, ¶ 77. He also informed medical staff that the plaintiff was verbally abusive and could not be safely treated at that time. *Id.*

At approximately 2:43am on September 27, 2018, Bergh completed a Notice of Disciplinary Hearing and Rights and informed the plaintiff of his rights before offering him a sanction of eighteen days' punitive segregation for the fight and the plaintiff's actions. ECF No. 69, ¶ 79. The plaintiff appealed the sanction and asked to wait twenty-four hours before entering segregation so he could shower. *Id.*, ¶ 80. He told Bergh he would accept the sanction after he was locked down later in the day on September 27, 2018. *Id.* Bergh

told the plaintiff that he would be allowed to shower during his recreation hour later that day. *Id.* An unspecified correctional officer later notified Bergh that the plaintiff had decided not to wait twenty-four hours and accepted the punishment offered. *Id.*, ¶ 81. Bergh entered that information into the Jail's system at 4:26am on September 28, 2018, before the end of his shift that morning at 6:30am. *Id.* Bergh had no further contact with the plaintiff and was not informed when or whether the plaintiff was given a new uniform, shower, or medical attention. *Id.*, ¶¶ 78, 82.[3]

After completing his shift through 6:30am, Bergh did not work further on September 28, 2018. ECF No. 69, ¶ 66. He did not work at all on September 29, 2018. *Id.*

### 2. Officer Ostrenga

On September 26 and 27, 2018, Ostrenga worked in Fox Pod on the third shift, which lasts from 10:30pm until 6:30am the next day. ECF No. 69, ¶ 35. At some point during one of those shifts, the plaintiff asked Ostrenga for a blanket and a book from his property bin, which Ostrenga retrieved for the plaintiff. *Id.*, ¶ 42. At no point did Ostrenga observe the plaintiff having difficulty breathing or experiencing any other medical issues from the OC spray. *Id.*, ¶ 46.

---

[3] Bergh also avers that the plaintiff "appealed his ticket demanding a shower right away." ECF No. 69, ¶ 80; ECF No. 66, ¶ 11. This ticket must have been a separate transaction from his sanction. It appears, therefore, that the plaintiff requested an immediate shower and, when it was denied, appealed the denial. He then (initially) told Bergh that he would wait twenty-four hours before accepting his punishment so that he could shower on September 27, 2018. Although the defendants do not specify when the plaintiff was able to shower, the plaintiff states in his complaint that he was permitted to shower in the evening on September 27, 2018. ECF No. 1 at 5.

On September 28, 2018, Ostrenga worked in the Work Release Center, which is in a different building at the Jail, and had no contact with the plaintiff. ECF No. 69, ¶ 36. On September 29, 2018, he worked in Gulf Pod and again had no contact with the plaintiff. *Id.*, ¶ 37. Between September 26 and 29, 2018, the plaintiff never asked Ostrenga for a new uniform, a shower, or medical care, and Ostrenga was not made aware that the plaintiff needed or requested any of those things. *Id.*, ¶ 38.

### 3. Officer Delorit

Delorit also worked on third shift at the Jail (10:30pm to 6:30am) on September 26 to 27, 2018, and from September 27 to 28, 2018. ECF No. 69, ¶ 47. He assisted with security checks in Fox Pod during his September 26, 2018 shift, but worked in Master Control during his September 27, 2018 shift. *Id.*, ¶¶ 48–49.

When Delorit began his shift on September 26, 2018, he was called to the plaintiff's cell, where the plaintiff told Delorit he had been sprayed with OC on the back of his head after being in a fight in Gulf Pod earlier that evening. *Id.*, ¶ 51; ECF No. 67, ¶ 3. The plaintiff did not tell Delorit that he had been sprayed in his face, mouth, or eyes, and Delorit did not see blood on the plaintiff's uniform. ECF No. 69, ¶ 51. Delorit asked the plaintiff if he needed anything to make himself comfortable. *Id.*, ¶ 52. The plaintiff requested a shower and a new uniform. *Id.* Delorit provided the plaintiff a fresh towel and instructed him to wash himself using the sink before he could shower during his recreation hour later that day. *Id.*, ¶ 53. Delorit also asked the plaintiff for his uniform size to provide him a new uniform. *Id.*, ¶ 54. Delorit did not find a new uniform for the plaintiff in the pod area and did not have access to the laundry room to obtain one. *Id.*, ¶ 55. After the plaintiff washed himself using the towel and sink, Delorit informed the plaintiff that he could look

7

for a new uniform during his break at 2:00am or ask an officer on the next shift to order one for the plaintiff. *Id.* The plaintiff told Delorit that he had washed up and was fine waiting for a new uniform. *Id.*, ¶ 56. Delorit made a list of uniforms that needed to be ordered and left it by the computer desk. *Id.*, ¶ 57.

At some later point in his shift, during the early morning hours of September 27, 2018, Delorit asked the plaintiff how he was feeling. ECF No. 69, ¶ 58. The plaintiff told Delorit he was feeling better, having washed off the OC spray. *Id.* He reminded Delorit that he would like a new uniform, to which Delorit responded that he had left a note for staff to locate him one. ECF No. 67, ¶ 7. Delorit had no further contact with the plaintiff once his shift ended at 6:30am. ECF No. 69, ¶ 59. At no point during Delorit's September 26 to 27, 2018 shift did the plaintiff ask Delorit for medical attention, and Delorit was not aware of any information or complaints by the plaintiff suggesting that he needed medical care. *Id.*, ¶¶ 60–61. Delorit did not observe the plaintiff having difficulty breathing or experiencing any other medical issues from the OC spray. *Id.*, ¶ 61.

Delorit did not work at the Jail on September 28, 2018, beyond 6:30am (the end of his September 27 shift) or at all on September 29, 2018. ECF No. 69, ¶ 50.

### 4. Officer Pearson

Pearson did not work at the Jail in the evening on September 26, 2018, when the plaintiff was in the fight with the other inmate, or the next day, September 27, 2018. ECF No. 69, ¶ 29. Pearson worked on September 28 and 29, 2018, but not in the Fox Pod, where the plaintiff was housed. *Id.*, ¶ 30. Pearson worked in Delta Pod and in security on those two days and had no interaction with the plaintiff. *Id.*, ¶¶ 31–32. Between the

8

evening on September 26, 2018, and September 29, 2018, Pearson was not informed that the plaintiff needed a shower, a new uniform, or medical care. *Id.*, ¶¶ 33–34.

## II. ANALYSIS

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

### A. Fourteenth Amendment Claims

The plaintiff was permitted to proceed on claims that the defendants forced him to continue wearing the uniform stained with OC spray and another inmate's blood and would not provide him a shower or care after he was sprayed with the OC spray during his fight. ECF No. 7 at 7–8. In the screening order, I noted it was not clear whether the plaintiff was a pretrial detainee or a convicted prisoner at the time of the events. *Id.* at 6. Although the parties do not make it clear, court records show that the plaintiff entered a guilty plea on June 11, 2018, but was not sentenced on those charges until November 19,

9

2018. The state court entered final judgment in the case on November 20, 2018. *See State of Wisconsin vs. Carl F. Self*, Outagamie County Case No. 2017CF000931. Because the plaintiff had not yet been sentenced at the time of the events in this case, his claims must be reviewed under the Due Process Clause of the Fourteenth Amendment. *Lewis v. Downey*, 581 F.3d 467, 474 (7th Cir. 2009); *see Hardeman v. Curran*, 933 F.3d 816, 821–22 (7th Cir. 2019) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015)).

Under the Fourteenth Amendment standard, the plaintiff must show that the defendants acted "with purposeful, knowing, or reckless disregard of the consequences" of their actions. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 354 (7th Cir. 2018). It is not enough to show they acted with negligence or even gross negligence. *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (citing *McCann v. Ogle Cnty.*, 909 F.3d 881, 886 (7th Cir. 2018)). The plaintiff also must show that the conditions of his confinement were objectively unreasonable; that is, he must show that the conditions were not "'rationally related to a legitimate non-punitive governmental purpose'" or that they were "'excessive in relation to that purpose.'" *Hardeman*, 933 F.3d at 822 (citing *Kingsley*, 135 S. Ct. at 2473). The court must "focus on the totality of facts and circumstances" that the defendants faced and "gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Williams*, 937 F.3d at 942.

The defendants contend that the plaintiff cannot show that the conditions to which he was subjected violated the constitution. ECF No. 68 at 15. They contend that the facts show the plaintiff was involved in the fight late in the day on September 26, 2018, and received a shower the next day. *Id.* They assert that the facts also show the plaintiff was

given a towel and soap immediately after the fight, until he could shower, and had access to a sink to wash himself in the meantime. *Id.* Because the plaintiff did not submit a request for medical attention and was verbally abusive at the time, the defendants contend, it was not unreasonable to delay his treatment. *Id.* at 15–16. The defendants assert that no officer acted objectively unreasonably towards him or in relation to his care following his fight on September 26, 2018, through September 29, 2018. *Id.* at 16–20.

### 1. **Corporal Bergh**

The undisputed facts show that immediately after the fight, Bergh observed the plaintiff and talked with him. Bergh did not see OC spray on the plaintiff's face or in his eyes, did not see blood on the plaintiff's uniform, and did not observe the plaintiff having trouble breathing or any medical issue. When he asked the plaintiff if he needed medical care, the plaintiff said no but asked to be taken to Fox Pod so he could wash the OC spray off himself. After his transfer, the plaintiff was verbally argumentative and told Bergh he wanted a shower and OC care, but he did not tell Bergh he was having a medical issue that required the shower or care. Because the plaintiff was verbally argumentative, Bergh did not have medical staff immediately tend to him and told the plaintiff to wash himself in his sink. Bergh reported the plaintiff's request for medical attention to medical staff but directed them, for their own safety and security, not to treat the plaintiff while he remained argumentative.

The plaintiff asserts that he was sprayed not only on his head and body but also in his face. ECF No. 1 at 3; *see* ECF No. 1-3 & ECF No. 1-7 at 1. He asserts that immediately after the fight, he told Bergh that he could not breathe and that his face and

11

body were burning, yet he also states that he did not ask Bergh to take him for medical treatment and just wanted to clean off the spray. ECF No. 1 at 3.

Bergh did not act unreasonably in denying the plaintiff immediate medical attention. Even if the plaintiff had been sprayed in the face, it is undisputed that he was argumentative and uncooperative, and the Jail has a reasonable policy to withhold treatment for an inmate who may pose a threat to the safety or security of the medical staff. *See Bell v. Wolfish*, 441 U.S. 520, 546 (1979) ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."). Bergh did not wholly deny the plaintiff medical care but told the medical staff to treat the plaintiff after he had calmed down, for their safety and security. The plaintiff does not challenge the Jail's policy of withholding medical treatment for inmates whose behavior may threaten the safety of medical staff.

For the same reason, Bergh did not act unreasonably in denying the plaintiff an immediate shower. Because the plaintiff was verbally argumentative and uncooperative, Bergh reasonably told the plaintiff to use the sink to wash himself until he calmed down and until a shower could be provided sometime the next day. The plaintiff contests the defendants' characterization of him as argumentative and uncooperative, but he has cited no facts and presents no evidence (not even an affidavit) to support his version.

Nor did Bergh purposefully or intentionally withhold a new uniform from the plaintiff. Bergh told the plaintiff that he would be provided a new uniform if one was available and as soon as he calmed down and complied with officers' orders. He told Jail staff the same—to provide the plaintiff a new uniform if one was available and when the plaintiff

had calmed down. He did not instruct the staff not to provide the plaintiff a new uniform or otherwise unreasonably withhold one from the plaintiff. Bergh had no further contact with the plaintiff after 2:43am on September 27, 2018, only hours after transferring the plaintiff to Fox Pod.

The evidence shows that the plaintiff did not receive a new uniform until September 28 or 29, 2018, which may be an unreasonably long time to wear a blood- and pepper-spray-stained uniform. But to be liable under § 1983, a defendant must have been personally involved in the alleged unconstitutional conduct. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (quoting *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010)). There is no evidence that Bergh is responsible for the extended delay in providing the new uniform. The undisputed facts show instead that Bergh instructed staff to provide the plaintiff a new uniform as soon as one was available. Even though the new uniform was not provided until days later, the plaintiff presents no evidence that Bergh was personally responsible for that delay. Bergh therefore cannot be held liable for the delay. He is therefore entitled to judgment as a matter of law.

### 2. Officer Delorit

Delorit did not begin work on September 26, 2018, until 10:30pm, nearly an hour after the plaintiff's fight and transfer to Fox Pod. According to Delorit's undisputed declaration, the plaintiff told Delorit soon after he began his shift about the fight and that he was sprayed on the back of the head, not on his face or in his eyes. Delorit provided the plaintiff a fresh towel, and the plaintiff was able to wash himself in the sink in his cell. The plaintiff requested a shower but did not tell Delorit he needed one for medical reasons or because he was experiencing negative symptoms from the OC spray. Once he was

able to wash himself, he told Delorit he was feeling better. Although the plaintiff requested a new uniform, he did not tell Delorit he needed one because of a rash or other negative symptom he was experiencing. Moreover, Delorit did not ignore the plaintiff's request but attempted to locate a new uniform for the plaintiff. When he could not find one, he told the plaintiff and left a note for staff on the next shift to provide the plaintiff a new uniform. The plaintiff told Delorit that he was fine waiting for a new uniform.

The undisputed evidence shows that Delorit's actions towards the plaintiff were objectively reasonable. Delorit tended to the plaintiff's concerns during their limited interaction and did what he could to make the plaintiff feel comfortable. Because the plaintiff did not request medical attention, Delorit did not seek any for him. Because the plaintiff told Delorit he felt fine after washing himself in his sink, Delorit did not attempt to provide him an immediate shower. The plaintiff did request a new uniform, so Delorit looked for one and, when he could not find one, left a note for staff the next day to provide one for the plaintiff. Delorit had no further contact with the plaintiff related to the September 26, 2018 fight, so he cannot be held personally responsible for any additional delay in providing the plaintiff a new uniform. *See Colbert*, 851 F.3d at 657. Because there is no evidence that Delorit purposefully or recklessly withheld medical attention, a shower, or a new uniform from the plaintiff, he is entitled to judgment as a matter of law.

### 3. Officer Ostrenga

Ostrenga's only contact with the plaintiff during the relevant events was when he retrieved a blanket and book for the plaintiff sometime on September 26 or 27, 2018. He did not notice the plaintiff having any difficulty breathing or other medical issue, and the plaintiff did not ask Ostrenga for a shower, a new uniform, or medical care. There is no

14

evidence showing Ostrenga took any part in the decisions regarding the plaintiff's care immediately following his fight or in the days after, and there can be no serious argument that Ostrenga's acts in providing the plaintiff the property he requested were objectively unreasonable. Ostrenga is entitled to judgment as a matter of law.

### 4. Officer Pearson

It is undisputed that Pearson had no contact or interaction with the plaintiff between September 26 and 29, 2018; was never informed whether the plaintiff requested a shower, a new uniform, or medical care after his fight; and took no part in the decisions regarding the plaintiff's custody care on those dates. Because there are no facts showing Pearson was personally involved in any condition about which the plaintiff complains, he cannot be liable for those conditions under § 1983. *See Colbert*, 851 F.3d at 657. The plaintiff's uncorroborated, conclusory allegations about Pearson in his response are not evidence sufficient to create a genuine dispute of fact regarding his involvement. *See* Fed. R. Civ. P. 56(c)(1); *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Pearson is therefore entitled to judgment as a matter of law.

## B. The Plaintiff's Contentions

The plaintiff raises several challenges to the defendants' assertions. As noted above, the plaintiff failed to respond to the defendants' proposed findings of fact, and he fails to cite to any proposed findings in support of his contentions. I will therefore consider his contentions only to the extent they are supported in his verified complaint and by evidence elsewhere in the record. *See Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013); *Ford v. Wilson*, 90 F.3d 245, 246–47 (7th Cir. 1996).

The plaintiff contends that the defendants knew about the blood on his uniform. Only Officer Lauder's statement notes the blood on the plaintiff's uniform. ECF No. 62-2 at 2. But Lauder is no longer a defendant in this action, and there is no evidence that any remaining defendant talked with Lauder about his observations, was aware the Lauder saw blood on the uniform, or himself observed blood on the plaintiff's uniform.

The plaintiff contends that the Jail's policy is to provide inmates immediate aftercare when OC spray is used. But the Jail also has a policy not to treat inmates who are argumentative or uncooperative, which the plaintiff undisputedly was immediately after the fight, for the safety of medical staff. Even if the plaintiff were correct that the jail's not providing him immediate care violated a Jail policy, § 1983 "protects against 'constitutional violations, not violations of . . . departmental regulation and . . . practices.'" *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (quoting *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003)). The violation of prison policy does not state a claim under § 1983. *See Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001).

The plaintiff accuses Bergh of fabricating his statement that he did not work on September 28, 2018. He bases his claim on the incident report Bergh entered at 4:26am on September 28, 2018, which notes that the plaintiff accepted his sanction. ECF No. 66-1. Bergh stated that he worked at the Jail from 6:30pm on September 27, 2018, through 6:30am on September 28, 2018. ECF No. 66, ¶ 3. His statement that he did not work later that day, *after* his shift had ended, is consistent with him having entered the incident report at 4:26am on September 28, 2018, *before* that shift had concluded.

The plaintiff accuses Corporal Leyendecker of fabricating his statements about where the OC spray hit the plaintiff and when he was given a shower. But Leyendecker

16

is no longer a defendant in this action. And his statements were based on his observations, of which the plaintiff lacks personal knowledge to contest. *See* Fed. R. Civ. P. 56(c)(4). Moreover, Leyendecker's statement is corroborated by that of Officer Pelischek, the officer who sprayed the plaintiff, and Bergh. And Leyendecker reported that the plaintiff was allowed to shower "later." ECF No. 1-1. The undisputed facts show the plaintiff was given a shower within at most twenty-four hours after being sprayed.

The plaintiff also submitted audio recordings of two phone calls he had with his mother on September 28, 2018. ECF No. 72. I have listened to the calls. In one call, the plaintiff tells his mother that he was in a fight and allowed to shower after, but he had to put back on the uniform he had been wearing, which was stained with blood and "pepper spray." He asks her to have someone call to complain about the uniform. In the second call, which is very brief, he reiterates to his mother that he still has the same uniform and requests that someone send him clean shirts. That the plaintiff told his mother he had to wear a soiled uniform corroborates his allegations about the uniform. But it does not create a genuine issue of fact whether any defendant purposefully or recklessly delayed his receipt of a clean uniform. Moreover, the undisputed facts show that no defendant was personally responsible for the delay in the plaintiff's receiving a clean uniform, so none may be held liable for that delay.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that all claims asserted or which could have been asserted in this lawsuit related to denial of medical care or Health Services Unit services, including but not limited to any and all claims asserted against Ava Gonzales, are hereby dismissed with prejudice and on the merits, without costs to any party.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (ECF No. 61) is **GRANTED**. The Clerk of Court shall enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. I may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. I may not extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin, this 17th day of March, 2020.

                                        s/Lynn Adelman_____
                                        LYNN ADELMAN
                                        United States District Judge